Our good case this morning is No. 13, 1658, Endo Pharmaceuticals v. Actavis, and also 1662, Endo Pharmaceuticals v. Laxang. Now, as to the logical way of presenting this argument, we assume that the appellant will proceed and discuss both appeals. Is that reasonable? If we need to modify as we go along, we'll do so. All right, proceed, then. Mr. Black. Thank you, Your Honor. May it please the Court, as you suggested, I'll address both appeals at the same time. While there are two appeals, there's really one legal issue here, which is the application of estoppel to bar the issuance of injunctive relief below by the district court. The district court erred as a matter of law in holding that estoppel would apply here, and the court's refusal to grant a preliminary injunction was therefore an abuse of discretion and should be reversed. Can I ask a couple of procedural questions, quick? Sure. On the 482, which is what I'm going towards, you only submitted in the appendix, interestingly, the very first page, the cover, actually, of your motion for a preliminary injunction. But then you also submitted some affidavit that was attached to it, which mentions the 482 patent, and it's been marked confidential, so I couldn't even get it online. Did you separately argue the 482 patent in the motion for the preliminary injunction? Did you argue it? Was it included in your motion? Yes, it was discussed. In your memorandum? It was discussed in the memorandum, as I recall. So the order, of course, ultimately denying the preliminary injunction just denies it and doesn't mention any patent numbers, so I assume it's denying everything that you asked for in the motion. We provided proof of infringement of the 482 patent with an expert affidavit and argued for injunctive relief based on that patent. That was uncontested. Well, and I noticed it a couple of points in the hearing, the oral hearing, when the district court said, so we're talking about 122 and 216, and I don't know if it was you or someone kept piping up, and don't forget 482, and he said I'll get to that later or something. And I never saw him expressly address that, and of course the order is ambiguous and mentions no patent numbers by name. So I'm trying to figure out, did he deny your relief on the 482 as far as you're concerned? Yes, he did. We moved for preliminary injunctive relief on all three patents, asserting infringement of all three patents with expert declarations. The infringement question was not disputed. Validity has been disputed, but we didn't reach validity. So if you're entitled to, if we decide the 482 is somehow situated differently than 122 and 216, you should have gotten your full measure of relief, right? If you're entitled to a P.I. on any one, that stops the product. That's correct. Now, I do want to inform the court that since the hearing, the 482 was subject to interference in the patent office. Interference or re-interference? Interference, actually. And three of the claims were canceled as part of the interference between the time that the district court ruled and we're here today. One of the claims, or several of the claims, are still extant, but that might require further proceedings in the district court. Interesting, okay. But it's still an issue of this appeal, is it not? Yes, Your Honor. Okay, thank you. So the district court, we, in response to our preliminary injunction motion, activists raised express license and estoppel. The district court, after a hearing, said that he wanted to take up the issues of license and estoppel first as preliminary matters. So the parties briefed that issue. We briefed the issue on an expedited basis, and Roxanne submitted their briefing only on those issues. Activists' initial submission was all of two pages on implied license, citing to the transcourt case. Were these two agreements that we had before us, were they separately negotiated? Yes. Okay. What am I to make out of what appears to be a significant difference between the two agreements, which at least I don't recall was discussed in the parties briefs, and that is with respect to 4.1c in each one of the two agreements, which 4.1c in the Roxanne agreement says that there's no license under any other patents, but that language does not appear in the activist agreement. That is true, Your Honor. That language does not appear in the activist agreement. What happened with activists was that the parties started negotiating a license agreement. And I think one of the things that's important here, and different from transcourt and some of the other cases, is that these were ANDA cases under the Hatch-Waxman Act. So the only thing that the parties can litigate under the Hatch-Waxman Act are patents which are listed on the Orange Book, which you can only list on the Orange Book certain types of patents. I don't think that's really responsive to my question. The whole question here is implied license under other patents, not specifically mentioned here. And there's a significant difference between the two agreements in that respect, in that the activist agreement doesn't mention no license under other patents, whereas the Roxanne agreement does say that. I agree, Your Honor. What I was trying to say is that because these are ANDA cases, what happens is when the parties negotiate these agreements, they have a serious discussion and negotiation over what the licensed patents are. The key question is what patents are licensed. In both agreements, there were negotiations over what the licensed patents were. But you're not responding to my question. Why is the different language in the two agreements? The course of the negotiations between the parties was different, different people involved, different time period involved. The agreement language is there's a lot of parallelism between the two agreements. Who drafted the agreement in the first place? I don't recall. Probably the first draft came from ENDO. The counter drafts came from the other side. Agreements went back and forth from both parties. And in the case of activists, you're right. There is no explicit provision like 4.1C in Roxanne. There is a statement that there's to be no implied license or estoppel in that agreement, which in the case of activists was put in at an important time. Activists asked for more licensed rights than we were willing to grant. We provided an initial draft, which provided a list of certain licensed patents. They asked for more extensive patents to be included into the agreement. We said no. We provided them the licensed patent definition, which now appears in the agreement. And at the same time that that was done, in order to ensure that we would not be here today, we put in a provision that said no implied rights shall be found in this agreement by implication by estoppel or otherwise. During the course of the activist negotiation, was there any discussion of the 122 and 216 patents? Do we know? There's nothing in the record on that, Your Honor. We have not had discovery, so we don't know. There was no explicit discussion regarding those applications. They had been published at the time, and we presume activists was aware of them, but we haven't had discovery on that point. They were published, and so you could just click on PAIR. If you went to 250, click on the link in PAIR, and it would pop right up. Absolutely, and competent lawyers look for these things. We were having a negotiation. Also, they could have asked you, right? How hard is it to say, do you have any other pending applications? Absolutely. They could have asked, and all they had to do was go to the Internet to find out, and presumably they did. Presumably they did. Well, we were having a negotiation, Your Honor, where a typical settlement agreement in a case would be, okay, here are the patents in suit. They're settled. But this negotiation was over. The licensed patents are X. Those are the one that was in litigation. And then they asked for the patents that were also listed on the orange book, and we said, fine, you don't infringe those, so we're happy to state that we're not going to sue you because we're not going to violate Rule 11. And then they came back and they said, well, we want continuations of those patents. And we said, okay, we can have continuations of those patents. Is this in the record? Yes, that's all in the record, yes. That's the negotiating history. With Activis? With Activis, yes. With Roxanne, we have explicit discussions about pending applications and explicit agreement from them and their argument that they have an estoppel. All of this started with separate Paragraph 4 certifications from Activis and Roxanne? That's correct. So they referred to the patents that were then in the orange book to start with? That's right. Is that correct? And is it also correct that the patents in the orange book at that stage, so it had to be the issued patents, were directed to the controlled release formulation in general, or did they also include this specific chemical? Some of them included specific compounds that were in the ENDO product. To list on the orange book the patents that have to cover our product, it doesn't necessarily mean that they cover the generic products. So in the case of one of the patents, the 250, there are specific ingredients required, xanthan gum and locust bean gum, which we have in our product but they don't have in theirs. But how can they have the ENDO granted unless they establish before the FDA that it's identical? They can establish that it acts identically in the body by doing blood tests that show that the same levels of oxymorphone are in the blood, even if the extended release vehicle is different. Was there an issue? I don't want to take us off onto a side excursion. Was there an issue as to whether or not the specific formulations in the patents that ended up in the settlement agreement, that that was being used and that would have satisfied the FDA? There was a dispute over one of the patents, which was being litigated, because we believe they infringed and they were defending. With respect to the other three patents, there was no dispute. We did not sue them because we had no basis for a lawsuit on those three patents. One of the three patents we did not sue on, and that everybody agreed was not infringed, was the 250, which was the patent which, at oral argument and during litigation below, was asserted to be the patent which gave rise to a right of estoppel with respect to the remainder of ENDO's patent portfolio. But that's what concerned the district court, isn't it? That here, all of the complex ENDO procedures initiated the action. There was a settlement agreement that was based, the entire foundation was the specific product for which the abbreviated applications had been filed. That's where we part ways, Your Honor, with the district court. First of all, the district court actually found that he couldn't reach a decision with respect to the intent of the parties or what the scope of the licensed patents were. And we think that if you can't do that, you can't determine the intent of the parties, you can't apply estoppel because estoppel is designed to promote the intent of the parties. The district court was clearly influenced by the fact that there was a prior case and that the product was the same. But we say that's not enough. There were negotiated agreements here with specifically licensed patents. The parties are allowed to enter into agreements and to identify which patents are going to be licensed, and that's what happened here. But that really is avoiding a main question. That is, if you are the patentee and you are sitting under other applications, sitting on other applications which could be listed in the Orange Book and which might bar the manufacture and sale of this product, why wouldn't you bring them up in the course of, say, the activist negotiation the way they were brought up in the Roxanne negotiation so that people are not misled about what they're getting in the agreement? Well, Your Honor, first of all, we couldn't list these patents on the Orange Book. No, no, but they will be listed later. Understood. They were, right? It's very common and normally the case that there are applications still pending in HENDA cases. Well, why is it so difficult for the patentee under these circumstances to say we have these other applications and we want you to know about them and to be clear that we're not giving you a license on them? Well, we believe we had a negotiation over the licensed patents. They asked for continuations of certain patents, and we granted them. But in terms of good faith negotiations, why is it a burden to ask the patentee under these circumstances to say we have these other applications, we want to be clear to you that you're not getting licenses under them? Your Honor, it would upset the settled course of the way licensing negotiations are done and the way license agreements are done. Basically, a rule like that would dramatically change thousands of license agreements. It would mean that the license patent provisions of an agreement have no force in it. I don't think you're really answering my question. Why is it such a burden to do what someone in a negotiation arguably would do anyway, to say, look, we're giving you this, but we want to be clear we're not giving you these pending applications? Would it possibly make licensing negotiations crazy and unwieldy to open the door? I mean, for example, in this case, hadn't your claims at the time of the actual negotiation actually been rejected by the board, in fact? Weren't they stood rejected? Yes, that is correct. And so I think that's why they gave up on them in Roxanne, quite frankly, because they're probably not going to get these anyway. But those claims have been rejected. So now you're going to have to open the door, reveal the application, discuss it. I mean, licensing negotiations would be magnified quite substantially, wouldn't they, by having to import discussion of all of this in every case as a matter of law into every license? I'm sure Judge Moore is trying to be helpful, but I'd like you to answer my question. Your Honor, if you're asking me the question, if the court set a rule going forward that said, along the lines of what I think you're suggesting, could parties deal with it, they absolutely could. But that's not been the law in the past, and it was not the law when we entered into these agreements. People negotiate agreements based on specific license patents. Often the law is very clear. The Spindle Fabric case and Transcor, the other cases say parties can negotiate licenses that cover all of their patents or only some of their patents. It's the intent of the parties that matters. I gather that it's no longer being pressed that the other side didn't know that there were other patents. They've never made that charge, and I do want to point out there are two types of estoppel. There's estoppel in pace, which is the normal type of estoppel where someone says something misleading. There's reliance and damage results from that. That's not been charged here. They've never said that there was any misrepresentation here. The estoppel that's been discussed is legal estoppel, which says that the intent of the parties was that these patents would be licensed. Suppose they didn't know about the patents. Suppose the actives didn't know about the other patents. If they didn't know about the other patents, then they were negligent because the patents were published and available, and they certainly knew that there was a risk that there were other applications out there that could cover the product. You started by saying sort of a normal lawyer in these situations would always look, right? Yes. It's not burdensome to look, and they would look. It's not burdensome at all, and that's the way these licenses are negotiated. It's not burdensome for you to bring it up either. Once we said to them that we are not giving you every patent that ENDO has, which we told them. Which you didn't do. That's the difference in the language between the two agreements. You didn't include language in the activists' agreement referring to no licenses under the patent. In the activists' agreement, we offered them a license to the patent that was being litigated and then the patents that were on the orange book. They asked for more than that, and we said no. We said you can have continuations and divisionals of those specific patents, and that's it. And for good measure, we put into the agreement a statement that there would be no implied rights and no estoppel. No estoppel. Can you direct me? I saw the declaration of, I think, Mr. Dowell about the negotiating history with Roxanne, but I don't remember seeing expressly the evidence that you're referring to now, which would be namely the negotiation with activists where they asked for more and you said no. Is that in a declaration that was maybe filed or in this appendix? It was the declaration of Mr. Donatiello. Am I remembering the wrong name? Who's Mr. Dowell? Mr. Dowell was the opponent. He was the Roxanne negotiator. That material appears at JA 4860. Okay. That's fine. And thereabouts. Let's hear from the other side. We want to be sure to save your rebuttal time. Thank you, Your Honor. It may be that we are going off on a tangent of a non-issue and there are enough issues to worry about. Thank you.  So you're Mr. Weiss. Yes, thank you. Please proceed. Thank you, Your Honor. I'm Charles Weiss for activists. There's a few points that I would like to raise and point to things in response to the bench's questions to Ando's counsel. First, with respect to the 482 patent, and there were some questions specifically raised by Judge Moore about that. The 482 patent was throughout the preliminary injunction proceedings on equal footing in terms of assertion by Ando of the others. Their opening papers referred to the 482, put in an infringement case. Our opposition papers, we had a 70-page expert declaration that touched on invalidity of all three patents and it specifically covered the 482. Among other things, noted that the senior party in the interference against the 482, which was then pending, had been awarded priority. So you're not contesting that the 482 was before the district court and the district court has ruled on the 482 as well as the other? It absolutely was, Your Honor. And in the record on page JA-6436, when Mr. Black pointed out that Judge Gersay's discussion was referring to the 122 and the 216 when he was calling out the numbers, but he wasn't calling out the third patent. Judge Gersay asked, do you need an adjournment to get into anything separate about that, and the answer was no. So there's no question it was in front of the district court. And we never argued the express license argument about the 482. And so the proposition by Endo that the district court erred in not resolving the express license issue before getting into the estoppel issue. Why should the estoppel issue apply to the 482? It's not related in any way and wasn't even owned by Endo at the time of the license. That's correct, Your Honor, but the cases don't require that. So what would the theory be as to why there shouldn't be an estoppel with respect to the 482? Sure, Your Honor. So if we look at the principles and the conditions that the court has set forth to have this estoppel, it is that there was a license granted, that there was consideration paid, and that the licensee at the licensor is trying to derogate from the licensee's ability to practice under the license. And so we have in the ANP versus United States case a situation where the government contractor bought an unrelated patent afterwards. Yeah, but the language of the settlement agreement was quite different there. It wasn't a license under specified patents. It was different, Your Honor, but I would say not in a way that matters. Because in both cases and all the cases, the court has to look at what are the rights granted. And in that case, the rights granted were as to the tool. That was all the government was allowed to do was that tool, that crimping tool. In our case, all that activists was allowed to do is sell the specific formulation that was in the ANDA. No, wait. Nowhere in these patents does it say you're allowed to sell the formulation in the ANDA. Does it? I don't think it mentions the word ANDA. No, it does, Your Honor. The definition of a PAN-ER generic product, which is the only thing that's licensed, says under ANDA number 79, and it calls it out by number. Well, yeah, sure, but it also ties it into the specific patents. Of course, they always do. But that's true in the TransCorp case also, Your Honor. Well, but TransCorp didn't involve a situation where a new patent not owned by the patentee at the time of the agreement was being asserted. But let's turn a limited amount of time here to the other two patents. And what does the record tell us? Let's assume that the rule of law established by these earlier cases, and I'm sure there's a disagreement about this, is that you can't sit on applications for other patents that would cover the product and not reveal them in the course of negotiations. And if you don't do that, there's an estoppel. There certainly is language in some of the earlier cases to that effect. If that were the principle, how would that apply here? What does the record show us about Activis' knowledge of these other two applications? The record is silent. And negotiating history that Mr. Black pointed to is really silent on this issue. We have their affiant, Mr. Donatello, who said that he went to one meeting with Activis and that he was no longer involved. So is your position that although these other applicants, you're no longer saying you didn't know about these other pending applications? Is that right? Not entirely, Judge Newman. I don't know if the client knew or not. It was not a case that I handled. It was not the people who I've worked with. But this is critical throughout. You haven't ascertained whether that knowledge was there. If necessary, perhaps there needs to be discovery. But if, in fact, it seems to me that it would be some grievous lapse if this published information on these critical products that Activis is about to launch, no one observed the publication referring to these. That's why, really, on the premise that we have been pursuing as to the obligation of the patentee to tell you about what is conceivable to me was not known. I certainly understand your point, Your Honor. But I would respectfully disagree that it is a requirement or that it is material to the kind of estoppel we're talking about. We're talking about equities now. Should there be a preliminary injunction at this stage? The trial judge felt uncomfortable with all of the confusing different positions. He said, you know, I can't decide it based on this simple argument and set it aside, but also did not approve the preliminary relief while he was deciding. I want to go back to the type of estoppel we're talking about here, Your Honor. The ANP versus United States case, which is from the Court of Claims, is a very good discussion. It talks about legal estoppel versus estoppel in Pais. Very generalizations, but the facts are different. Here the facts are quite specific, and it would be helpful to have your view on this situation. Okay. So, again, your short answer is I don't know. What happens in these negotiations, I think, is the question. What happens in these negotiations? Would it be normal to expect somebody to research pending applications, or do you rely on the other side to tell you what else is pending that's not included within the agreement? How do we know what the practice is? I don't think I can generalize, Your Honor, what the practice is. I've done a lot of licenses, and it's all over the map. But I will say two points I'd like to make in response to your question, which also relates to a question, Judge Moore, that you asked Mr. Black, which is, first of all, the cases don't require deceit or trickery or withholding. And that's absolutely clear. Suppose we disagree with you about that. Well, obviously the court could, but the precedent that we currently have… I understand your argument about the precedent, but hypothetically, let's assume hypothetically that we disagree with that. And we say that the cases require some sort of showing of unfairness in the negotiations where the patentee sat on applications, didn't disclose them, and allowed the negotiation to go forward with the possible understanding that there were no other problems in the future with respect to this product. So if that was the question, Your Honor, and this relates to Judge Moore's question also a little bit, which is if we're talking about the burden in the negotiations, I would submit that as between the prospective licensure, who of course knows what patent applications it has or should know, and the prospective licensee, which depending on the circumstances may be able to look them up if they've published or may not be able to look them up. But the burden would clearly be assigned to the prospective licensure under that circumstance to identify and make disclosure if the default rule is, as Your Honor is positing, in the hypothetical. And that would certainly not be an undue burden. And it is… Let me get this straight. I think I need to interrupt this conversation. Do you want to leave some time for your colleague? I do, Your Honor. He has five minutes left. You can use it up if my colleagues want to, or we can switch. Mr. Clement represents a different client. We're certainly friends, but we're competitors. But you're using his time is the point. And I apologize to the court and to him. All right. Pardon? Well, if I do that anyway. Okay. Thank you, Your Honor. Thank you, Your Honors. Allen Clement on behalf of Roxanne. First, I just want to touch on one of Judge Moore's prior questions regarding the 482 patent and just make clear for the record here that while the 482 patent was asserted in the preliminary injunction proceedings against Actavis, it is not asserted against Roxanne. You guys already have a license. You bought it from the prior owner. Exactly. So we're done. So that issue is not before you with regard to Roxanne. The second issue I want to take up was one of the things Judge Dyke mentioned about this difference in the language in 4.1c. And my argument on that is I don't believe that that language is any different than the language carving out patents or saying that no future patents applied in TransCore or AMP or General Protect. Those cases all talk about clauses that license does not apply to future patents. In TransCore, they had a statement, this covenant not to sue shall not apply to other patents issued as of the effective date of this agreement or to be issued in the future. They had another statement, no express or implied license or future release whatsoever is granted to Mark IV or any patent. So those clauses are very similar to 4.1c. I understand. But I think your basic problem is there's a good deal of evidence in the record here that these applications were brought up in the Roxanne negotiations and you tried to draft language that would include them, which was rejected. And I guess under those circumstances, I'm having some difficulty in seeing why there should be no stopping. I think that those license negotiations, Roxanne got broader language for the license. It doesn't just say the three patents, the three Orange Book patents and continuations and continuations in part thereof. ENDO originally just wanted to keep it just to the 456 patent. Roxanne came back and said, no, we want broader language. And there was negotiation between the parties. How it came back, though, is broader language than what's in the Actavis Agreement because it says the OPANA ER patents, which were the 456, the 933, and the 250, and any other applications that claim priority to those patents, including but not limited to continuations, continuations in part. So it was a broader scope. So Roxanne believed it was covered under these patents. That's not the language that was finally agreed to. Oh, sure it was. If you go to... Where does it say claim priority? I think it's in 1.16. What page are the... 4563. Are you arguing on appeal that the 122 and the 216 are continuations of the 250? No, I'm saying they claim priority to the 250. They claim priority to the... There's a priority claim that's... To the 250. Okay, great. Let's look at either 122 and 216 and show me where they claim priority to the 250. Sure. Well, I think, Your Honor, you have to take it in context of 1.16b. You said they claim priority. Let me get there. Let me just get... So show me where they claim priority. Okay, I just want to say it doesn't just say claim priority to. It says claim priority to... But you said they claim priority. No. Did you misspeak? No, I don't think I misspoke either. I don't want to... Show me where 122 and 216 claim priority to the 250. Right, but I also said there was this including clause, including continuation. I don't care about your agreement. Okay, so if we go to... I want you to show me where 122 and 216 claim priority to the 250. So if you go to Exhibit 17 of, I think, Mr... I think it's at 5232. Is this in your appendix? I think it's in the appendix, yeah. I think Endo put it in a very nice chart. 5232. Oh, this is the blue and green chart. Green, right. Yeah. Okay, great. So if you look at... This is the chart they created. So if you look at the 122 and the 216, you can see they go back through the blue, the 357, all the way to the 250. Wait, wait. So you're saying that when they go back to the provisional, that somehow that amounts to a claim of priority to a separate chain? There's a similar priority. They claim the priority to the same application. The first page of the 216 is in the appendix, 47. Where does it claim priority? It claims priority to the 357. Yes. Right. And the 250 also... No. The 250 also claims... It says the continuation of the 192 patent. So it's in related application data. Where is the claim of priority? There's a claim in the related provisional. The last provisional on the 250 is 60303357. That's the blue. But that's not the 250. Right. But the language in the... So this doesn't claim priority. It claims priority to a provisional, which the 250 also claims priority to. But this doesn't claim priority to the 250. I think it does in the context of how the language of the license agreement is written. You know better than that. But what I'm saying here is the language of the license agreement says it doesn't just say a continuation. Why do we have the words including, continuations, continuations in part in there? It doesn't claim priority to the 250. It might be related, but it doesn't claim priority, right? It was Roxanne's understanding. Does it claim priority to the 250? Yes, it does. I think it does under the way the license agreement is written. It most certainly does because it has this including continuation, continuation in part. But I think it's kind of a red herring. This is more whether or not we have an express license. Did you tell the district court that it was in fact not just claiming priority, but it was a continuation of the 250 expressly? I don't recall whether or not I did that. I don't recall that. But it's my understanding. Do you think it is a continuation of the 250? Is it a continuation? No, I don't think it is a continuation of the 250. But I think it is an application that claims priority to the 250 through the 357. You and Mr. Weiss were going back and forth in the hearing and in the briefing. They're substantially identical. And unfortunately, I just picked up his brief. And I do know that he's a registered patent attorney. And the very first line in the appendix says, Endo's 122 patent and 216 are continuations of a patent called out by number licensed in the 2009 settlement agreement. And it goes on, Endo cannot now deny 122 and 216 are not continuations of the 250. Well, that's on my line. That's Mr. Weiss's. Okay, I'm sorry. I'll find where you said it. I just grabbed the wrong sentence. But you agree they're not continuations. They're not continuations. And continuations has a particular meaning in patent law under Section 120 and 376R and the MPEP. But the language of the license is not limited to continuations. What would you guys assert to the district court that they're continuations? I think what I asserted to the district court is that they fall within the language of the license agreement. No, you said they were continuations. I'm sorry? As we just saw, you told the judge they were continuations and tied that in to the license agreement. Your argument is not totally devoid of substance or merit. But these misleading statements don't have your cause. I don't think I was misleading. I think what I was conveying to the district court, and I don't have my exact language here, is that it claims priority to under the language of this license agreement. The license agreement says including continuations, continuations in part. Because it has that including language, which is something we negotiated into the contract, that means that the claims priority language must be broader than just continuations in part and divisional. That's what I clearly argued to the court. Okay, but let's assume for the moment that you've convinced us that there's at least some ambiguity in the language. The problem is you go to the negotiating history of this agreement, and if I'm recalling correctly, you asked to have licenses under these pending applications, which became the 216 and the 122, and you didn't get that. Correct? Well, I don't know. I don't agree with that because I think that we did get it. Why don't you agree with that? Because they wanted to just leave it at the 456 patent. We wanted to cover other patents in the same family that cover the Roxanne product. Just like Actavis, it's just to one product. Was my recollection wrong that you specifically raised these applications, which became the 122 and the 216? I don't think that we specifically raised them. There's no statement in the record that we specifically raised them. Mr. Donatello puts in a declaration where somehow he, in paragraph 39, he somehow understands what Roxanne understood at the time, what this claims priority two language meant, but there's no statement in the record as to what Roxanne understood. That's rank speculation, and it's hearsay what's in paragraph 39. But you're not telling us that Roxanne didn't know about these applications. I'm not saying that, and I think that Roxanne covered it by going to this claims priority two language. By signing an agreement that explicitly doesn't mention them and says no other licenses? Those numbers were not even in existence at the time. Those were pending patent applications. We didn't know what applications were going to be issued. You didn't have the issued patent number. That's true. Right. And that's the reason why you think they weren't included? And that's why we went to claims priority two language, because that's language you usually use in order to make sure you get the whole patent family. No, you get what you claim priority to. Well, I think that my understanding of claim priority two means if I have a straight line, I can go back to this 357, and there's a reason for that. You get everything down the tree. So in a divisional, that would mean you would get these totally separate inventions off on different branches. Well, I think that language of the agreement covers divisionals. Certainly. I think that we get everything going. If I had just said, as in the… But claim priority doesn't. As in the Actavis art… It's a term of art. Are you a patent lawyer also? I'm clearly a patent lawyer, and I understand what it means, but I'm looking at the agreement. But do you understand it to mean what you're saying now it means? As a patent lawyer, a registered patent attorney, do you understand that the word claims priority two means… It doesn't actually have to mention it on its face. It just… I think in the context of this agreement, where it says claims priority to these applications, including… It would be extraneous to say continuation… Are you saying I should give different meaning to the words claims priority in the license than a normal patent lawyer would understand? I think so, and I have that including language there because I think that including language makes it broader. But I don't… But your problem, as I was suggesting to you earlier, and if you look at 4867, paragraph 39 of this declaration or affidavit, the negotiator for ENDO says I specifically discussed the applications for the 122 and the 216, and we said we weren't willing to give a license under those. Right, but there's no statement that Roxanne didn't think it was getting a license to it. That may have been what ENDO was thinking. That's not a statement as to what Roxanne was thinking at the time. Negotiation doesn't depend on what people were thinking. It depends on what was said. Right, and we came back, and we broadened language to have this claims priority two language in there when they only wanted to… I think what you're arguing is that we don't have a full record as to the negotiations and that might show something different. It would very well, and I think that when he comes back and he says that he knows what Mr. Dow eventually agreed to, I think that is rank speculation. That's hearsay. There's no statement. It's not hearsay. Well, he's offering that for the truth of the matter. Every time there's a dispute about the meaning of a contract and you have to go to parole evidence and negotiating history, somebody has to say what the negotiating history is. Talking about what people said during the negotiation is not hearsay. Okay, when he says we – okay, I don't want to – I think when he says we agreed to something, that is hearsay. When he says we said something, that would not be hearsay. There's no record that we ever said that. He's trying to get into the mind of our negotiators saying we agreed to that. And I think, to me, that falls on the hearsay. But I just want to go back to this whole mutual – the intent. Well, let's just see where we are. We're running out of time. Can we move on? Any more questions? I think we understand the – Thank you, Your Honor. – at this stage of activists and Roxanne. Well, you get the last word, Mr. Black. Thank you, Your Honor. Let me just address, Judge Moore, your question about where in the activist appendix the materials appear related to the negotiations. Our original proposal is at 5144. Well, I'm sorry, I didn't hear you. Our original proposal, proposed agreement, was at 5144, and that included a license to the litigated patent and a covenant to the other Orange Book patents. They responded by asking for continuations of those patents, which meant that they were thinking about other applications which had not yet issued or which were out there. And we responded by saying, okay, you can have continuations of those patents. But then in our next draft – So it was them that expressly came up with the idea that they might need some subset of pending applications. Right. They clearly were thinking about it because they asked for continuations of visuals. But they didn't ask for language that would cover the 122 and the 216. No, they did not. They did not ask for the right to every patent ENDO had. They could have if they did. Which might suggest they didn't know about it. Well, it's interesting. Your Honor, I hadn't really appreciated the point that you're raising because it didn't come up below. I've had a chance to think about it now, and I can see how Your Honor could think that a rule would be better if people were required by law to raise patents, even if they're listed on the Patent Office website. That certainly wasn't the rule at the time that we negotiated the agreement. There's been no finding by the district court that estoppel in pays or payas would apply that there was any kind of misrepresentation here, which of course would require them to present evidence. I don't think anybody's saying there was a misrepresentation. Well, it's an interesting question, Your Honor. If both parties knew about the applications, or if there's no evidence that they didn't know, then to state that we would have had to raise it and negotiate it explicitly, or we lose our rights for 10 years to assert these patents, would be a tremendously harsh result and not one consistent with equity. You know what's troubling, nevertheless, and what obviously troubled the district judge, is what, in fact, came out of this negotiation and this settlement. There were the paragraph 4 certifications. There was the patents on this product, whatever it is, the commercial product, were at risk in that they would be subject to all of the 30 months of litigation that goes on. And so something was settled. Correct. And the district judge was persuaded, and I didn't see otherwise, that these defendants, I didn't see these generic producers thought that they had acquired what they needed to proceed with a generic product, because that's what the paragraph 4 certification is supposed to achieve. Now all of these extra complications come in, not because of the certification, but because of the specifics of the settlement agreement. That is the way the district judge approached it. Although he first said, I've looked at the license agreements, I've heard what the party said, I've looked at the negotiating history, I really can't figure out what the party's intent is here. And then he went on and he said, but I'm going to find a stop anyway. And we think that was error. And one of the reasons he got there, Your Honor, was because the hearing was a tremendously confusing affair. I will stand up for Mr. Clement. He was not the one who introduced the idea that these patents were continuations. That was activist counsel who did that. And I suggest that if there was any suggestion at activists that they were misled, that they were unaware of these applications that might issue or that we had cheated and that we would have seen that in the briefing, that would have been argument number one. It's not cheated. It's not cheated. You keep saying misled, cheated. That's not the point. The question is who should have the burden of bringing up the other applications. And since they didn't ask to have the other applications covered during the negotiations, that at least suggests they weren't aware of them. They may have been, and you may discover that if there's discovery on this point. But certainly you would have thought if they were asking for additional coverage that they would ask for additional coverage about applications of which they were aware. No? No, Your Honor, because they knew that we wouldn't have granted that. Like we didn't grant it for Roxanne. You didn't tell them that. Your Honor, there is no evidence in this record that they were unaware. They never even made the argument. The district court made the finding. In a license, in fact, most of the time, do they include language on pending applications, for example? Is it commonplace? Do people know that these words exist by which they could cover a larger gamut? Absolutely. In the Transcore General Pro-Tech, there's a quote from Spindle Fabric, you know, at a long string site that says, parties can agree to license some patents or all patents. I guess that same thing applies to you, that you could have included in the Activis agreement the same language you had in the Roxanne agreement about not covering other patents. Your Honors, we did include a provision that said no implied license or estoppel, and here I stand to stop. That's the problem. We had a provision that says what patents are licensed. That provision must be given effect, or you will be upsetting the settled expectations of parties to thousands of license agreements. When you negotiate the license patents in an agreement, that's not an afterthought. That's not a, you know, miscellaneous provision about, you know, some boilerplate. That's an important provision, and ENDO was entitled to rely on that license, and ENDO should not be a stop for 10 years from asserting the patents that are in this litigation. Have additional Paragraph 4 certifications been filed now that these two patents issued? On these patents, they don't have to file certifications on them because they came after. However, we haven't talked about it, but there's a whole other set of related cases on the reformulated abuse-resistant product. Those patents are listed against the abuse-resistant product, and they've certified to them, and that's being listed. Those are the crush-resistant products? Yes. Are they at issue here at all? No. No, Your Honor, other than to say that there have been Paragraph 4s, but not on these products. Okay. Any more questions? No. Any more questions? All right. Thank you all. The case is taken into submission.